**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ALABAMA RIVERS ALLIANCE, 4439 5th Ave S Ste 1000, Birmingham, AL 35222, | ) ) ) | |
| BLACK WARRIOR RIVERKEEPER, 712 37th Street South, Birmingham, AL 35222, | ) ) ) | |
| HEALTHY GULF, 935 Gravier St #700, New Orleans, LA 70112, | ) ) ) | |
| OGEECHEE RIVERKEEPER, P.O. Box 16206, Savannah, GA 31416, and | ) ) ) | |
| SAVANNAH RIVERKEEPER, P.O. Box 60 Augusta, GA 30903, | ) ) ) | Civil Case No. 26-2623 |
| Plaintiffs, | ) ) | **COMPLAINT** |
| v. | ) ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS, 441 G Street, N.W. Washington, DC 20314, | ) ) ) ) | |
| LIEUTENANT GENERAL WILLIAM H. GRAHAM, JR., 441 G Street, N.W. Washington, DC 20314, | ) ) ) ) | |
| Defendants. | ) | |

**<u>INTRODUCTION</u>**

1.      This case challenges the U.S. Army Corps of Engineers' ("the Corps") 2026 reissuance of Nationwide Permit 12. The 2026 reissuance was arbitrary, capricious, and not in accordance with law, in violation of the Clean Water Act, Endangered Species Act, National Environmental Policy Act, and Administrative Procedure Act. Accordingly, the Court should vacate Nationwide Permit 12 and remand to the Corps for further proceedings.

2.      The Clean Water Act prohibits the discharge of dredged or fill material without a permit. To satisfy that requirement, the Corps issues two types of permits: individual permits and general permits. Individual permits are more environmentally protective and include more robust public participation requirements. General permits offer streamlined permitting procedures but are only available for activities with minimal individual and cumulative environmental effects.

3.      For example, Nationwide Permit 1—a general permit that applies "nationwide"— can be used to install "aids to navigation." The Corps estimates that each use of this permit affects about 0.017 acres of jurisdictional waters. Nationwide Permit 9 is used to install "[s]tructures, buoys, floats, and other devices" and the Corps estimates that each use of this general permit affects about 0.01 acres of jurisdictional waters. Nationwide Permit 36 authorizes "the construction, repair, or replacement of boat ramps." Each use of this general permit affects about 0.027 acres of jurisdictional waters.

4.      Nationwide Permit 12 is a different animal. This general permit authorizes the construction of oil and natural gas pipelines hundreds of miles long with thousands of individual waterbody crossings. According to the Corps' own estimates, the 2026 version of Nationwide Permit 12 will be used to cross approximately 18,500 rivers, streams, and wetlands over its five-year life cycle, impacting around 7,500 acres of waters of the United States—an area about 964 times the size of the Lincoln Memorial Reflecting Pool.

5.      Unlike installing buoys or fixing boat ramps, pipeline construction has devastating effects on waterbodies. During construction, pipeline developers commonly use explosives and heavy equipment to dig and backfill trenches in the streambed or wetland itself, crushing or killing any fish, mussels, and other aquatic organisms in their path. In-water

construction also releases huge plumes of sediment that choke aquatic invertebrates, smother fish eggs, and deplete dissolved oxygen levels, among other negative effects.

6.    The Corps makes Nationwide Permit 12 available to pipeline developers using a two-step process. First, every five years the Corps reissues Nationwide Permit 12. Importantly, at the time the Corps reissues Nationwide Permit 12 it does not know what projects might rely on the permit, where they will be located, the quality of waters those projects will cross, or what communities or species will be affected. Second, for some—but not all—pipeline projects, the Corps subsequently verifies application of Nationwide Permit 12 to the specific project. Developers of pipeline projects that do not require verification can use Nationwide Permit 12 without ever involving the Corps.

7.    According to the Corps, it satisfies its environmental review obligations under the Clean Water Act and National Environmental Policy Act when it reissues Nationwide Permit 12 at the national level. Assessing impacts at the national level—before the agency knows where or how frequently the permit will be used—can work for activities with truly minimal individual and cumulative impacts, like the installation of a buoy that affects 0.01 acres of jurisdictional waters. But this process is unworkable for massive pipelines that cumulatively impact *thousands* of acres of jurisdictional waters.

8.    The Corps' gap-ridden and error-filled 2026 analysis for Nationwide Permit 12 is a prime example of this unworkability. In its analysis, the Corps admits that it lacks the data to fully assess the impacts of Nationwide Permit 12. However, it nonetheless concludes that Nationwide Permit 12 will have no more than minimal environmental effects by arbitrarily weighing the permit against the rest of human activity; relying on mitigation measures that the Corps acknowledges do not work and are not often undertaken; and inappropriately deferring its

3

cumulative-effects analysis to division and district engineers. This analysis is flatly inconsistent with the Clean Water Act and National Environmental Policy Act.

9.      To make matters worse, the 2026 reissuance of Nationwide Permit 12 is also plainly inconsistent with the Endangered Species Act. At least two courts—including this Court—have told the Corps that it must formally consult under Section 7 of the Endangered Species Act with the U.S. Fish & Wildlife Service and the National Marine Fisheries Service regarding Nationwide Permit 12's aggregate effects on endangered and threatened species and their critical habitat. As it has for decades, the Corps again ignored these judicial decisions and plowed ahead without formal consultation in 2026.

10.     Pipeline developers are already using or planning to use Nationwide Permit 12 to authorize waterbody crossings across the country. For example, developers in the Southeast have announced plans to use Nationwide Permit 12 to cross more than 2,200 waterbodies in Alabama, Georgia, and Mississippi to construct the interconnected South System Expansion 4 and Mississippi Crossing pipelines. Construction of these pipelines is set to begin this fall.

11.     Plaintiffs Alabama Rivers Alliance, Black Warrior Riverkeeper, Healthy Gulf, Ogeechee Riverkeeper, and Savannah Riverkeeper ("Conservation Groups") are organizations that will be adversely affected by these and other Nationwide Permit 12 pipeline projects. Conservation Groups' members live, recreate, research, conduct business, and view wildlife in the path of these pipeline projects. Though these fast-tracked projects will soon tear apart the rivers, streams, and wetlands that these members rely on, the Corps does not allow the public to comment on its permitting decision for these specific projects. Instead, the agency pretends that the public had a meaningful opportunity to comment during Nationwide Permit 12's national reissuance in early 2026—even though the Corps admitted it lacked the data to fully assess

Nationwide Permit 12's impacts at that time and did not know what projects would be approved under that permit.

12.     If Nationwide Permit 12 were vacated, pipelines like South System Expansion 4 and Mississippi Crossing could still be built under individual Clean Water Act permits. As part of the individual permitting process, members of the public—including Conservation Groups' members—would be able to submit comments to the Corps regarding aquatic impacts and mitigation measures. In addition, unlike a Nationwide Permit 12 project, the Corps would be required to select the least environmentally damaging practicable alternative at each waterbody crossing—thereby avoiding or mitigating some of the worst harms from pipeline construction.

13.     Accordingly, Conservation Groups seek a declaration that the Corps' 2026 reissuance of Nationwide Permit 12 violated the Clean Water Act, Endangered Species Act, National Environmental Policy Act, and Administrative Procedure Act. Conservation Groups request the Court vacate Nationwide Permit 12 and enjoin or stay the Corps from deploying it unless and until it complies with the law.

## JURISDICTION AND VENUE

14.     Jurisdiction is proper in this Court because this action arises under the laws of the United States, including the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*, National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal-question jurisdiction), 28 U.S.C. § 1346(a)(2) (United States as a defendant); 5 U.S.C. § 702 (APA judicial review); and 16 U.S.C. § 1540(g) (ESA citizen-suit provision). This Court may issue a declaratory judgment and further relief requested pursuant to 28 U.S.C. §§ 2201–02.

15.     The 2026 version of Nationwide Permit 12 that Conservation Groups challenge here is a final agency action within the meaning of the APA and is judicially reviewable under § 704 of that Act. *See Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d 1, 7–8 (D.D.C. 2005).

16.     As required by ESA Section 11, 16 U.S.C. § 1540(g)(2)(A)(i), Conservation Groups gave notice of the ESA violations alleged in Claim 2 of this complaint and Conservation Groups' intent to sue under the ESA more than 60 days prior to the filing of this complaint. Defendants have not remedied the violations alleged in the notice letter and Defendants' violations are continuing.

17.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(A) because Defendants U.S. Army Corps of Engineers and Lt. Gen. William H. Graham, Jr., are agencies, officers, or employees of the United States acting in their official capacities that reside in the District of Columbia. Venue is also proper in this District under 28 U.S.C. § 1391(e)(1)(B) because the nationwide permit that is the focus of this lawsuit was developed in the District.

## PARTIES

### Plaintiff Conservation Groups

18.     As part of their core missions, Conservation Groups work to protect waterbodies and the people, animals, and plants that use and inhabit them. Nationwide Permit 12 directly frustrates these missions by authorizing environmentally destructive pipelines across thousands of waterbodies with no local public input or site-specific environmental review under the CWA or NEPA.

19.     Conservation Groups and their members live, work, research, visit, and recreate in areas that will be affected by pipeline projects authorized under the 2026 version of Nationwide Permit 12. For example, Conservation Groups and their members would be negatively affected

by construction of the South System Expansion 4 and Mississippi Crossing pipelines, among others. The developers of the South System Expansion 4 and Mississippi Crossing pipelines plan to use Nationwide Permit 12 to satisfy their obligations under the CWA. Upon information and belief, the Corps will verify the use of Nationwide Permit 12 for these and other projects in the coming weeks. Construction of the South System Expansion 4 and Mississippi Crossing pipelines is set to begin this fall. Upon information and belief, pipeline developers also plan to use Nationwide Permit 12 to construct other pipelines in Conservation Groups' focal areas, including the Koscuisko Junction and the Elba Bridge pipeline projects.

20.    To the extent required, Conservation Groups have exhausted their administrative remedies.

21.    Conservation Groups' injuries, including injuries to their members, would be redressed by an order from this Court vacating Nationwide Permit 12 and requiring the Corps to comply with the CWA, ESA, NEPA, and APA.

22.    If Nationwide Permit 12 were not available, the Corps could authorize pipeline projects using individual CWA permits. Unlike under Nationwide Permit 12, pipeline projects proceeding under individual permits must select the least environmentally damaging practicable alternative for waterbody crossings, which would reduce harm to environmental resources that Conservation Groups and their members use and rely on. Similarly, unlike Nationwide Permit 12 projects, pipeline projects proceeding under individual permits would also be subject to project-specific public comment regarding the Corps' permitting decision. A public comment period would allow Conservation Groups and their members to explain to the Corps how its project-specific permitting decision will impact their interests and how to avoid said impacts.

23.     Proper compliance with the ESA requires the Corps to conduct a formal programmatic consultation for Nationwide Permit 12. That process could result in reasonable and prudent alternatives or measures that avoid or mitigate impacts to protected species that Conservation Groups and their members deeply value. Alternatively, a programmatic consultation process could conclude that Nationwide Permit 12 cannot be issued at all because it will jeopardize listed species or adversely modify critical habitat.

### Alabama Rivers Alliance

24.     Alabama Rivers Alliance is a nonprofit corporation with its principal office in Birmingham, Alabama. Alabama Rivers Alliance is a statewide network of more than 100 partner organizations collectively working to protect and restore all of Alabama's water resources. To achieve this mission, Alabama Rivers Alliance works to build partnerships, educate and empower citizens, and advocate for sound water policy and its enforcement.

25.     Alabama Rivers Alliance has over 500 members and supporters, primarily in Alabama. Many of these members regularly visit Alabama's 132,000 miles of mapped streams and rivers to fish, hunt, kayak, canoe, swim, look for wildlife, and enjoy nature. Some members enjoy conducting scientific surveys or looking for the many rare and listed species that inhabit Alabama's watersheds, including the alligator snapping turtle and several threatened or endangered mussel species, among many others. All of these members derive scientific, aesthetic, and spiritual benefit from Alabama's outstanding aquatic resources and the species that inhabit them.

26.     Alabama Rivers Alliance's members will be adversely affected by pipeline projects that are using or planning to use Nationwide Permit 12. For example, member Robert Hastings frequently canoes, kayaks, swims, and looks for wildlife in portions of the Alabama

River and Autauga Creek watersheds that would be impacted by the South System Expansion 4 project. As noted above, the pipeline developer for this project intends to use Nationwide Permit 12 to authorize in-stream construction across Alabama, including in Autauga Creek and its tributaries. This construction will permanently alter stream channels and water flow; cause sedimentation and erosion that reduces water quality; pollute waterways; and harm aquatic species like turtles, fish, and mussels. This will harm Mr. Hastings and other Alabama Rivers Alliance members and prevent them from enjoying the area as they did prior to construction. Nevertheless, members like Mr. Hastings plan to continue using these areas even if they are irreparably harmed by the South System Expansion 4 project and other Nationwide Permit 12 projects in the region.

**Black Warrior Riverkeeper**

27.     Black Warrior Riverkeeper is a nonprofit corporation with its principal office in Birmingham, Alabama. Black Warrior Riverkeeper's mission is to protect and restore the Black Warrior River and its tributaries. To advance this mission, Black Warrior Riverkeeper patrols the river and its tributaries, documents pollution problems and advocates for cleanups, responds to citizen complaints, serves as a spokesperson for the river, and educates its members and the public about the river and threats to it.

28.     Black Warrior Riverkeeper has over 6,000 members, primarily in Alabama. Many of these members regularly visit the more than 16,000 miles of mapped streams in the Black Warrior River watershed to fish, hunt, canoe, swim, observe wildlife, boat, and enjoy nature. Some members enjoy conducting scientific surveys or looking for the many rare and listed species that inhabit the watershed, including the Black Warrior waterdog, inflated heelsplitter mussel, and alligator snapping turtle, among many others. All of these members derive scientific,

9

aesthetic, and spiritual benefit from the Black Warrior River watershed's outstanding aquatic resources and the species that inhabit it.

29.    Black Warrior Riverkeeper's members will be adversely impacted by pipeline projects that are using or planning to use Nationwide Permit 12. For example, member Nelson Brooke frequently canoes, fishes, observes wildlife, and conducts research in portions of the Black Warrior River watershed that would be impacted by South System Expansion 4. As noted above, the pipeline developer intends to use Nationwide Permit 12 to authorize in-stream construction in the Black Warrior River watershed, including on French Creek and its tributaries. This construction will permanently alter stream banks and beds, cause extensive sedimentation, pollute waterways, degrade wildlife habitat, and harm species that inhabit the streams or rely on them for fresh water and food. These effects will harm Mr. Brooke and other Black Warrior Riverkeeper members and prevent them from enjoying the area as they did prior to construction. Nevertheless, members like Mr. Brooke plan to continue using these areas even if they are irreparably harmed by the South System Expansion 4 project and other Nationwide Permit 12 projects in the region.

**Healthy Gulf**

30.    Healthy Gulf is a nonprofit corporation with its principal office in New Orleans, Louisiana. Healthy Gulf's mission is to collaborate with and serve communities who love the Gulf of Mexico by providing the research, communications, and coalition-building tools needed to reverse the long pattern of over-exploitation of the Gulf's natural resources. Healthy Gulf seeks to address the environmental and community impacts of polluting industries and projects across the five Gulf states. Healthy Gulf works to prevent damaging projects that destroy

wetlands, impact water quality, and degrade fisheries and wildlife habitat. Healthy Gulf pursues its mission by performing research, providing education, and building community engagement.

31.    Healthy Gulf has more than 400 members and 39,000 supporters. Many of these members and supporters live in or regularly visit Alabama and Mississippi. Healthy Gulf's members love and rely on rivers, streams, and wetlands across these states for drinking water, fishing, hunting, birding, swimming, scientific research, viewing and appreciating protected wildlife, and many other uses. These members gain food and water, along with scientific, aesthetic, and recreational benefits from water resources in Mississippi and Alabama that will be impacted by pipeline projects using Nationwide Permit 12.

32.    Healthy Gulf's members will be harmed by pipeline projects that are using or intending to use Nationwide Permit 12 to authorize wetland and waterbody crossings. For instance, member Andrew Whitehurst frequently boats, fishes, hunts, and recreates on the Ross Barnett Reservoir and Pearl River downstream from the proposed Mississippi Crossing pipeline. That project plans to use Nationwide Permit 12 and would cross many streams and disturb many wetlands in the Pearl River watershed. Construction of this pipeline will destroy habitat, alter stream channels, increase turbidity and suspended solids, kill or harm species, pollute waterways, smother eggs, and cause erosion both upstream and downstream, among other negative effects. These impacts will harm Mr. Whitehurst and other Healthy Gulf members and prevent them from enjoying these waters, wetlands, and habitats as they did prior to construction. Nevertheless, members like Mr. Whitehurst plan to continue using these areas even if they are irreparably harmed by the Mississippi Crossing and South System Expansion 4 projects and other Nationwide Permit 12 projects in the region.

11

**Ogeechee Riverkeeper**

33.     Ogeechee Riverkeeper is a nonprofit corporation with its principal office in Savannah, Georgia. Ogeechee Riverkeeper's mission is to protect, preserve, and improve the water quality of the Ogeechee River basin. To advance this mission, Ogeechee Riverkeeper collects water-quality data, educates its members and the public about water-quality issues, enforces water-quality standards, organizes volunteer events and river clean-ups, and supports strong and sensible water policies.

34.     Ogeechee Riverkeeper has nearly 800 dues-paying members and thousands of supporters, primarily in Georgia. Many of these members regularly visit the Ogeechee River watershed to fish, kayak, boat, swim, research, take photographs, and observe rare or threatened species. Others rely on the Ogeechee River basin to provide a source of clean drinking water. All of these members derive scientific, aesthetic, and spiritual benefit from the Ogeechee River watershed's outstanding aquatic resources and the species that inhabit it.

35.     Ogeechee Riverkeeper's members will be adversely affected by pipeline projects that are using or planning to use Nationwide Permit 12. For example, member Damon Mullis frequently boats, fishes, observes wildlife, and conducts research in portions of the Ogeechee River watershed that would be impacted by the South System Expansion 4 project. As noted above, the developer for this project intends to use Nationwide Permit 12 to authorize in-stream construction in the Ogeechee River watershed. This construction will destroy habitat, alter stream channels, kill or harm species, pollute waterways, smother eggs, and increase sedimentation and erosion, among other negative effects. These effects will harm Mr. Mullis and other Ogeechee Riverkeeper members and prevent them from enjoying the area as they did prior to construction. Nevertheless, members like Mr. Mullis plan to continue using these areas even if

they are irreparably harmed by the South System Expansion 4 project and other Nationwide

Permit 12 projects in the region.

## Savannah Riverkeeper

36.     Savannah Riverkeeper is a nonprofit corporation with its principal office in

Augusta, Georgia. Savannah Riverkeeper's mission is to protect and restore the 400-mile

Savannah River and its 10,577-square-mile watershed through advocacy, education, and

collaboration. To advance this mission, Savannah Riverkeeper monitors water quality in the

basin, works with scientists and government agencies to understand and abate pollution,

advocates for the protection of rare and listed species, and educates its members and the public

about water-quality issues.

37.     Savannah Riverkeeper has over 350 members, primarily in Georgia and South

Carolina. Many of these members regularly visit the Savannah River watershed to boat, fish,

swim, research, volunteer on river cleanups, and observe rare or threatened species like Atlantic

and shortnose sturgeon. Like more than a million people in South Carolina and Georgia, many

members also rely on the Savannah River watershed to provide a source of clean drinking water.

All of these members derive scientific, aesthetic, and spiritual benefit from the Savannah River

watershed's outstanding aquatic resources and the species that inhabit it.

38.     Savannah Riverkeeper's members will be adversely affected by pipeline projects

that are using or planning to use Nationwide Permit 12. For example, member Tonya Bonitatibus

frequently boats, fishes, observes wildlife, and conducts research in portions of the Savannah

River watershed that would be impacted by the South System Expansion 4 project, including

Spirit Creek. As noted above, the pipeline developer for this project intends to use Nationwide

Permit 12 to authorize in-stream construction in the Savannah River watershed, including in

13

Spirit Creek. This construction will destroy stream channels, degrade wildlife habitat, cause sedimentation and erosion both upstream and downstream, and impact fish and aquatic invertebrates, among other negative effects. These effects will harm Ms. Bonitatibus and other Savannah Riverkeeper members and prevent them from enjoying the area as they did prior to construction. Nevertheless, members like Ms. Bonitatibus plan to continue using these areas even if they are irreparably harmed by the South System Expansion 4 project and other Nationwide Permit 12 projects in the region.

## Defendants

### U.S. Army Corps of Engineers

39.     Defendant U.S. Army Corps of Engineers is a federal agency responsible for overseeing CWA Section 404 permitting, including the issuance of general permits like Nationwide Permit 12. The Corps issued the 2026 version of Nationwide Permit 12 challenged in this lawsuit.

40.     The Corps is responsible for ensuring that its actions—including the 2026 reissuance of Nationwide Permit 12—comply with applicable laws, including the ESA, CWA, NEPA, and APA.

### Lieutenant General William H. Graham, Jr.

41.     Defendant Lieutenant General William H. Graham, Jr., is the Chief of Engineers and the Commanding General of the U.S. Army Corps of Engineers. Lieutenant General Graham is headquartered in Washington, D.C. and is designated to act for the Secretary of the Army. Lieutenant General Graham is sued in his official capacity. Lieutenant General Graham is ultimately responsible for ensuring that Nationwide Permit 12 complies with applicable laws.

14

## LEGAL BACKGROUND

### Clean Water Act

42.     The Clean Water Act was enacted in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

43.     Congress pursued those goals, in part, through a permitting scheme. Congress prohibited the discharge of any "dredged or fill material into" waters of the United States without a permit, 33 U.S.C. §§ 1311(a), 1344, but gave the "Secretary of the Army, acting through the Chief of Engineers," *id.* § 1344(d), authority to "issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the [jurisdictional] waters at specified disposal sites," *id.* § 1344(a). These permits are generally known as Section 404 permits.

44.     The Corps issues two types of Section 404 permits: individual permits and general permits. 33 C.F.R. § 320.1(c).

45.     Individual permits are "issued following a case-by-case evaluation of a specific project," including an evaluation of "practicable alternatives." *Id.* § 323.2(g); 40 C.F.R. § 230.10(a). Individual permits may not be issued "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a).

46.     The requirement to identify alternatives, including those with "less adverse impact on the aquatic ecosystem," however, is "not directly applicable to General permits." *Id.* § 230.7(b)(1).

15

47.     "General permits" may only be issued for categories of discharges that "are [1] similar in nature, [2] will cause only minimal adverse environmental effects when performed separately, and [3] will have only minimal cumulative adverse effect[s] on the environment." 33 U.S.C. § 1344(e)(1); *see also* 33 C.F.R. § 323.2(h)(1); 40 C.F.R. § 230.7(a). These three determinations "shall" be documented in writing and "must be completed before any General permit is issued." 40 C.F.R. § 230.7(b).

48.     General permits may be issued for a maximum of five years. 33 U.S.C. § 1344(e)(2).

49.     General permits may be issued on a state, regional, or nationwide basis. 33 U.S.C. § 1344(e)(1); 33 C.F.R. § 325.5.

50.     Nationwide permits are a species of general permit effective anywhere in the United States. Nationwide permits are "designed to regulate with little, if any, delay or paperwork certain activities having minimal [environmental] impacts." 33 C.F.R. § 330.1(b).

51.     When issuing nationwide permits, the Corps' written assessment of the "potential individual and cumulative impacts" of each nationwide permit must be "based upon" application of the Section 404(b)(1) Guidelines (the "Guidelines") issued jointly by the Corps and the U.S. Environmental Protection Agency ("EPA"). 40 C.F.R. § 230.7(b).

52.     Those Guidelines prohibit issuance of any permit that causes or contributes to "violations of any applicable State water quality standard." *Id.* § 230.10(b)(1).

53.     The Guidelines require the Corps to consider several "factors" when issuing a permit, including "effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites;" the "spread of pollutants or their byproducts outside of the disposal site"; the "loss of fish and wildlife habitat" or degradation of wetlands; and adverse effects on

"recreational, aesthetic, and economic values." *Id.* § 230.10(c). The Corps may not issue a permit if it concludes these effects together "will cause or contribute to significant degradation of the waters of the United States." *Id.*

54.     Before issuing a permit, the Guidelines also require the Corps to make multiple factual determinations and support each with "documented information." *Id.* § 230.7(b)(1). These factual determinations include the permit's effects on sedimentation/turbidity, water quality, water circulation, threatened or endangered species, other aquatic organisms, wildlife, wetlands, water supplies, fisheries, and recreation, among others. *Id.* §§ 230.11; 230.20–54.

55.     Finally, the Guidelines specifically require the Corps to assess "secondary effects" on the aquatic ecosystem, defined as effects "associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material." *Id.* § 230.11(h)(1). These secondary effects "shall be considered" before a permit is issued. *Id.*

56.     In addition to undertaking the analysis required by the Guidelines, the Corps also must conduct a public-interest review. This review is intended to assess the "probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." 33 C.F.R. § 320.4(a)(1).

57.     As part of its public-interest review, the Corps must consider "[a]ll factors which may be relevant" to the permit, including "conservation, economics, aesthetics, general environmental concerns, wetlands, . . . floodplain values, land use, . . . recreation, water supply and conservation, water quality, energy needs, safety, . . . considerations of property ownership and, in general, the needs and welfare of the people." *Id.*

58.     If, after "balancing the [permit's] favorable impacts against the detrimental impacts," *id*. § 320.1(a)(1), the Corps concludes that issuing the permit "would be contrary to the public interest," then it may not issue the permit, *id*. § 320.4(a)(1).

### Endangered Species Act

59.     "The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).

60.     To that end, the ESA requires federal agencies "to afford first priority to the declared national policy of saving endangered [or threatened] species"—even when this goal conflicts with agencies' "primary missions." *Id.* at 185.

61.     ESA Section 7(a)(2) commands each federal agency to ensure "that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2).

62.     "Action" means "all activities *or programs* of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States" and specifically includes the issuance of "permits" as well as "actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02 (emphasis added).

63.     The term "action" specifically includes "framework programmatic actions," which "approve[] a framework for the development of future action(s) that are authorized, funded, or carried out at a later time" at the site-specific project level. *Id.*

64.     To enforce the requirements of Section 7(a)(2), the ESA and its implementing regulations set out a detailed consultation process to assess the impacts of proposed agency

actions. Depending on the species at issue, consultation is conducted with either the U.S. Fish and Wildlife Service ("FWS") and/or the National Marine Fisheries Service ("NMFS") (referred to interchangeably as the "Service" below). *Id.* § 402.01(b).

65.     Formal Section 7 consultation is required if either the agency taking action (the "action agency") or the Service concludes that the proposed action—including a programmatic action—"may affect listed species or critical habitat." *Id.* §§ 402.14(a)–(b).

66.     The threshold for triggering formal consultation—the "may affect" standard—is low. *Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018 (9th Cir. 2009). "Any possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement[.]" Interagency Cooperation—Endangered Species Act of 1973, as Amended; Final Rule, 51 Fed. Reg. 19926, 19949 (June 3, 1986); *see also Lockyer*, 575 F.3d at 1018–19 (same).

67.     To determine if formal consultation is necessary, the action agency—here the Corps—may first prepare a "biological assessment," or it may may engage in informal consultation with the Service. 50 C.F.R. §§ 402.12–13. If the biological assessment or informal consultation determines that the proposed action is "not likely to adversely affect listed species or critical habitat" and the Service concurs, then the consultation process ends. *Id.* § 402.13(c); *id.* § 402.12(k)(1); *id.* § 402.14(b)(1). But if the biological assessment or informal consultation finds that a project "may [adversely] affect listed species or critical habitat," the Service and the action agency must proceed to formal consultation. *Id.* § 402.14(a).

68.     In sum, if an agency action—including a programmatic action—has any possible direct or indirect effects on listed species or critical habitat, then formal consultation is required,

19

unless the agencies are able to determine that agency action is not likely to adversely affect listed species or critical habitat.

69.    Indeed, programmatic actions that "may affect" listed species or critical habitat must go through programmatic formal consultation so the Service can "address[] an agency's multiple actions on a program, region, or other basis" as a whole. 50 C.F.R. § 402.02; *see also Brownlee*, 402 F. Supp. 2d at 10–11 (holding that the Corps' failure to complete Section 7 consultation for previous version of Nationwide Permit 12 violated the ESA).

70.    While framework programmatic actions receive "further section 7 consultation" at the project level, this does "not relieve the Federal agency of the requirements for considering the effects of [a programmatic] action . . . as a whole." 50 C.F.R. § 402.14(c)(4). In other words, a programmatic action "still requires a programmatic consultation to meet the requirements of section 7(a)(2)," even if specific projects developed under that program "are subject to site-specific stepped-down, or tiered consultations." Endangered and Threatened Wildlife and Plants; Regulations for Interagency Cooperation, 84 Fed. Reg. 44976, 44997 (Aug. 27, 2019).

71.    Multiple courts—including this Court—have held that formal consultation is required for the issuance of Nationwide Permit 12. *Nat'l Wildlife Fed. v. Brownlee*, 402 F. Supp. 2d 1 (D.D.C. 2005); *N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, 454 F. Supp. 3d 985, 993–94 (D. Mont.), *amended by*, 460 F. Supp. 3d 1030 (D. Mont. 2020).

72.    The product of formal consultation is a biological opinion prepared by the Service. 50 C.F.R. §§ 402.14(e), (h). If the biological opinion concludes that the agency action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat, then the Service must develop "reasonable and prudent

alternatives" to the proposed action that "avoid the likelihood" of jeopardy or habitat modification, or explain why such alternatives do not exist. *Id.* § 402.14(h)(2).

### National Environmental Policy Act

73.     NEPA was enacted in 1969 "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. Federal agencies must fulfill NEPA's mandates "to the fullest extent possible." *Id.* § 4332.

74.     NEPA has twin aims: "First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (internal citation and quotation marks omitted).

75.     NEPA's objectives are "realized through a set of 'action-forcing' procedures that require that agencies take a '"hard look" at environmental consequences,' . . . and [] provide for broad dissemination of relevant environmental information." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citation omitted).

76.     These procedures require agencies to complete certain actions for "every" "proposal[]" for major federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

77.     If an agency concludes that a proposal for major federal action is likely to have "a reasonably foreseeable significant effect on the quality of the human environment," it must prepare an Environmental Impact Statement ("EIS"). *Id.* § 4336(b)(1). This "detailed statement" must disclose the "reasonably foreseeable environmental effects of the proposed agency action"

and consider "a reasonable range of alternatives to the proposed agency action," among other things. *Id.* § 4332(2)(C).

78.    If the need for an EIS is unclear—i.e., if it is uncertain whether the major federal action will significantly affect the quality of the human environment—an agency may first prepare an Environmental Assessment ("EA"). *Id.* § 4336(b)(2).

79.    If the EA concludes that the proposal will likely have significant effects, the agency must prepare an EIS. *Id.* Likewise, if the EA cannot conclude that a major federal action will *not* have a significant effect on the environment, or if there are substantial questions whether an action may have significant effects, the agency must prepare an EIS as well. *See* 33 C.F.R. § 333.20(a) (stating an EIS is required "in cases where that [EA] cannot conclude in a finding of no significant impact").

80.    If the EA reveals that the action will not have significant effects, then the action can proceed with a Finding of No Significant Impact. *Id.* A Finding of No Significant Impact must document "*why* . . . the selected alternative will not have a significant effect on the quality of the human environment." *Id.* § 333.16(a)(2) (emphasis added).

81.    Pursuant to Corps regulations, if the agency concludes that there will not be significant effects "based on mitigation," then the EA must "state any mitigation requirements enforceable by the agency or voluntary mitigation commitments that will be undertaken by the applicant to avoid significant effects." *Id.* § 333.16(a)(3).

82.    In preparing an EIS or EA, a federal agency must "ensure the professional integrity, including scientific integrity, of the discussion and analysis in" the document. 42 U.S.C. § 4332(2)(D).

22

83.     Effects that must be considered under NEPA include cumulative effects. *See*

*Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976).

### Administrative Procedure Act

84.     The APA creates a right to judicial review for any person wronged or aggrieved

by a final agency action when there is no other adequate remedy available. 5 U.S.C. §§ 702, 704.

85.     Under the APA, a reviewing court shall "hold unlawful and set aside agency

action[s], findings, and conclusions" that the court finds to be "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction,

authority, or limitations," or "without observance of procedure required by law." *Id.* § 706(2).

86.     An agency action is arbitrary and capricious, and must be set aside, where, among

other things, the agency "entirely failed to consider an important aspect of the problem, offered

an explanation for its decision that runs counter to the evidence before the agency, or is so

implausible that it could not be ascribed to a difference in view or the product of agency

expertise" or where the agency's action is not based on a "reasoned analysis." *Motor Vehicle*

*Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983).

### FACTUAL BACKGROUND

### Environmental Impacts of Pipeline Construction

87.     Nationwide Permit 12 authorizes the construction of oil and natural gas pipelines

and associated facilities in waters of the United States.

88.     Construction of oil and natural gas pipelines and associated facilities can have

significant environmental effects on aquatic and upland resources.

89.     The issuance of Nationwide Permit 12 directly or indirectly causes modifications

to the land and water.

23

**Impacts from in-water work**

90.     To construct a pipeline through a stream, river, or wetland, developers can either drill under the waterbody or dig a trench through the waterbody itself.

91.     The most common crossing method involves digging a trench through the waterbody, called an "open cut" crossing. Open-cut crossings can be done in the "wet"—meaning an excavator digs directly in the waterbody itself while water is present—or in the "dry"—where water is diverted around the trench so that workers can dig in drier conditions.

92.     Open-cut crossings cause short-term and long-term negative impacts to aquatic ecosystems.

93.     To start, open-cut crossings can kill or harm any fish, macroinvertebrates, and other aquatic organisms in the area of active construction. Direct mortality from pipeline construction is a particular risk for low mobility species like freshwater mussels.

94.     Open-cut crossings over harder substrates (like boulders and bedrock) require additional equipment such as jackhammers and explosive charges to break apart rocks in the pipeline trench. Blasting can kill mussels, fish, and other aquatic species.

95.     Equipment failures and associated spills of oils and other toxic materials can also occur during construction in or near the waterbody. These spills can kill or harm fish and wildlife and contaminate nearby surface and ground water.

96.     In addition, pipeline construction often requires locally sourced water for drilling, testing, and dust control. For example, the proposed South System Expansion 4 pipeline will require an estimated 136 million gallons of water during construction. Withdrawing water from local streams and wetlands can kill or trap fish and wildlife and eliminate or reduce habitat.

24

97.     Open-cut crossings of streams can also disturb stream flow and wetland hydrology. "Dry" trench construction requires altering water flow using diversion devices like flumes, dams, and pumps. Flow alterations can alter habitat, inhibit fish and aquatic organism passage, and increase sedimentation and erosion.

98.     Vegetation clearing along the pipeline route also commonly results in the conversion of one wetland type—like a forested wetland—to another—like a scrub-shrub wetland. Wetland conversion can disturb wildlife habitat, reduce wildlife food supply, change drainage patterns, decrease soil stability, and increase water temperatures due to the loss of shade, among other effects.

99.     Pipeline construction in streams or wetlands also directly and indirectly contributes to increased turbidity and suspended sediment loads in local waterbodies.

100.    Trench digging, blasting, and backfilling in the waterbody itself results in increased turbidity and suspended sediment in the water column both during and after construction.

101.    Trenching also alters the stream channel itself, which can lead to channel incision (where the stream cuts downward into its streambed, deepening the channel), lateral migration (where the stream shifts side-to-side), and head cutting (where erosion and bank destabilization migrates upstream). Channel incision, lateral migration, and head cutting all contribute to increased erosion and sedimentation both upstream and downstream.

102.    During dry open-cut construction, installation and removal of diversion devices— like cofferdams—also causes increased turbidity and suspended sediment loads.

103.    The sediment impacts from pipeline construction can trigger violations of state water-quality standards and other environmental laws.

104.    For example, West Virginia and Virginia collectively issued hundreds of notices of violation to the developer of the Mountain Valley Pipeline—originally a Nationwide Permit 12 project—for violations of state water-quality standards, including the state standards for turbidity.

105.    Similarly, during construction of the Rover pipeline—another Nationwide Permit 12 project—in Michigan, Ohio, Pennsylvania, and West Virginia, the pipeline developer accumulated more than 680 violations of environmental laws, including notices of violation related to insufficient run-off and erosion controls.

106.    The sediment impacts from pipeline construction can persist for years.

107.    Even temporary in-water pipeline construction activities can cause long-term changes to streams and aquatic organism assemblages.

108.    Sedimentation impacts from in-water pipeline construction can also extend beyond the immediate construction area.

109.    For example, during pipeline construction of a Pacific Gas & Electric pipeline expansion in Idaho, sediment plumes from pipeline construction were distinguishable up to 23 miles downstream.

110.    Similarly, during pipeline construction of the WB Xpress pipeline in West Virginia (another Nationwide Permit 12 project) a pump-around dam failed during in-stream construction on the North Fork of the South Branch of the Potomac River. Sediment discharged as a result of this failure was documented 19 miles downstream.

111.    Sedimentation causes numerous adverse effects to aquatic resources and wildlife.

112.    For aquatic wildlife, deposited and bedded sediment contribute to physiological effects (e.g., decreased oxygen binding to hemoglobin); behavioral effects (e.g., loss of

equilibrium, increased breathing); morphological effects (e.g., lesions in blood vessels); and organismal and population effects (e.g., decreased growth and abundance, mass mortality).

113. For example, increased turbidity and high suspended sediment loads can cause long-term impacts to invertebrate communities downstream of the construction by reducing invertebrate biomass, growth rates, and species diversity and increasing invertebrate mortality. Suspended sediment can also contribute to changes in invertebrate assemblages, such as fewer invertebrates with gills (e.g., mayflies).

114. Increased turbidity and suspended sediment can also reduce light infiltration and therefore reduce primary production by algae, aquatic plants, and other photosynthesizing organisms.

115. Because invertebrates, algae, and aquatic vegetation are the base of the aquatic food chain, negative effects to these organisms can have cascading effects on the larger aquatic ecosystem.

116. Increased suspended and deposited sediment also causes negative impacts to fish populations. These impacts can include smothering of fish eggs, reduced reproductive success, reduction of juvenile survival rates, reduction of food sources, as well as reduction of in-stream dissolved oxygen which causes respiratory distress and death. Suspended sediment can also contribute to changes in fish assemblages, such as fewer fishes that depend on sight for feeding (e.g., salmonids, cyprinids, and centrarchids).

117. Sedimentation is a threat to anadromous sturgeon species, including the Alabama sturgeon, Gulf sturgeon, shortnose sturgeon, and Atlantic sturgeon, and other fish species like the Pearl Darter, Robust Redhorse, and Alabama Shad.

118.    Freshwater mussels are also sensitive to increased sediment loads. Sediment can physically cover freshwater mussels, smothering and killing them at depths as low as 0.6 cm. Sediment also interferes with mussel feeding, reduces mussel fertilization success and the development of mussel larvae, and alters the habitat of host fish that mussel larvae rely on early in their life cycle.

119.    Sediment discharged during and after pipeline construction can have cumulative effects on affected watersheds and aquatic species.

### Aquatic impacts from upland work

120.    Upland pipeline construction also has negative effects on aquatic resources and wildlife.

121.    During pipeline construction, developers must clear a right-of-way along the path of the pipeline. This involves felling trees and removing vegetation within the right-of-way, including sensitive riparian vegetation along waterways. Rights-of-way widths vary, but generally exceed 100 feet during active construction. Following construction, a smaller portion of the right-of-way is kept clear for the life of the pipeline to facilitate access and repairs.

122.    In addition to clearing vegetation for the right-of-way, pipeline developers must also clear vegetation to construct access roads and associated pipeline facilities.

123.    A single pipeline project can require clearing thousands of acres. For example, pipeline construction of the interconnected Mississippi Crossing and South System Expansion 4 pipelines will require vegetation clearing across more than 11,000 acres—equivalent to more than 8,300 football fields.

124.    Clearing vegetation for the pipeline right-of-way, access roads, and associated pipeline facilities negatively affects local water quality.

125.    Removal of vegetation significantly increases the volume of runoff during rainfall events, in part because stormwater is no longer being captured or slowed by standing vegetation. When more stormwater runoff makes its way into streams, stream flows increase, which can further erode the streambed and banks and contribute to in-stream sedimentation.

126.    Removal of vegetation during pipeline construction also increases soil loss. Without vegetation to hold soil in place, stormwater can wash exposed soil into nearby streams and wetlands, causing increased turbidity and higher suspended sediment loads.

127.    Pipeline construction equipment also compacts soils. Because compacted soils have poor water infiltration, water tends to flow over them rather than soak into them. That further increases stormwater run-off rates and strips critical topsoil.

128.    Because portions of the pipeline right-of-way must be kept clear of woody vegetation for the life of the pipeline, the increased runoff rates and soil loss caused by upland pipeline construction persist over the long-term.

129.    The sediment runoff from upland pipeline construction acts cumulatively with sediment discharged or stirred up during pipeline construction in streams or wetlands.

### Nationwide Permit 12

130.    Nationwide Permit 12 is a general Section 404 permit with nationwide scope.

131.    The current 2026 version of Nationwide Permit 12 authorizes "[a]ctivities required for the construction, maintenance, repair, and removal of oil and natural gas pipelines and associated facilities in waters of the United States, provided the activity does not result in the loss of greater than 1/2-acre of waters of the United States for each single and complete project." Reissuance and Modification of Nationwide Permits, 91 Fed. Reg. 768, 859 (Jan. 8, 2026).

132.    For most nationwide permits, "single and complete project" means "the total project proposed or accomplished by one owner/developer or partnership or other association of owners/developers." *Id.* at 885. But for linear projects—like pipelines approved under Nationwide Permit 12—a "single and complete project" means "all crossings of a single water of the United States (*i.e.*, a single waterbody) *at a specific location*." *Id.* (emphasis added). "For linear projects crossing a single or multiple waterbodies [sic] several times at separate and distant locations, each [individual] crossing is considered a single and complete project." *Id.*

133.    In other words, pipeline developers may rely on Nationwide Permit 12 at each location where the project crosses a water of the United States—even for multiple crossings of the same jurisdictional stream or wetland—so long as: (1) the Corps considers each individual crossing to be "separate and distant" from the next; (2) each individual crossing does not cause the loss of more than half-acre of waters of the United States; and (3) other Nationwide Permit 12 terms and conditions are met.

134.    "In most cases, permittees may proceed with activities authorized by [nationwide permits] without notifying the [Corps]." 33 C.F.R. § 330.1(e)(1). The Corps estimates that Nationwide Permit 12 will be used more than a thousand times each year without the Corps ever knowing.

135.    In some situations, however, prospective permittees must submit a preconstruction notification to the Corps. A notification is required for Nationwide Permit 12 if the overall pipeline project "is greater than 250 miles in length"—longer than the distance from Washington, DC, to New York City—"and the project purpose is to install new pipeline" along most of the pipeline route. U.S. Army Corps of Eng'rs, Nationwide Permit 12 Decision Document (Jan. 5, 2026) at 3 [hereinafter "Decision Document"]. A notification is also required

if the permittee determines that their activity "might affect" or will occur "in the vicinity" of ESA-listed species or designated critical habitat. 91 Fed. Reg. at 877.

136.    After reviewing the preconstruction notification, the Corps engineer may "verify" the application of Nationwide Permit 12 to the specific project and the permittee may begin construction. 33 C.F.R. § 330.2(c). Alternatively, permittees may presume their activities are consistent with Nationwide Permit 12 and begin construction if they do not hear back from the Corps within 45 days of submitting their preconstruction notification. *Id.* § 330.1(e)(1). This timeline does not apply if the notification was issued due to possible effects on ESA-listed species or critical habitat. 91 Fed. Reg. at 877.

**The Corps' 2026 Nationwide Permit 12 CWA and NEPA Analysis**

137.    On June 18, 2025, the Corps published a proposal to reissue all then-existing nationwide permits, including Nationwide Permit 12, and issue one new nationwide permit. Proposal to Reissue and Modify Nationwide Permits, 90 Fed. Reg. 26100 (proposed June 18, 2025). The Corps invited public comment for a period of thirty days. *Id.* On July 18, 2025, Black Warrior Riverkeeper, Ogeechee Riverkeeper, Savannah Riverkeeper, and other groups submitted comments to the Corps that focused on Nationwide Permit 12 and outlined violations of the CWA, ESA, NEPA, and APA.

138.    On January 8, 2026, the Corps reissued Nationwide Permit 12 without any of the changes or modifications requested by Black Warrior Riverkeeper, Ogeechee Riverkeeper, Savannah Riverkeeper, and other conservation groups. The Corps simultaneously issued a "Decision Document" for each nationwide permit including Nationwide Permit 12.

139.    According to the Corps, because "the Corps fulfills the requirements of NEPA when it issues its national decision document for the reissuance of [Nationwide Permit 12],

specific activities authorized by [Nationwide Permit 12] do not require additional NEPA analysis." Decision Document at 133. The Corps also used the same Decision Document to fulfill the agency's analytical obligations under the CWA.

140.    To evaluate the 2026 version of Nationwide Permit 12's effects under the CWA and NEPA, the Corps assessed the estimated impact of "activities authorized by [Nationwide Permit 12] during the next five years"—the maximum permit term allowable under the CWA— on the "current environmental setting" or "baseline." *Id.* at 24, 46.

141.    The baseline comprised the "terrestrial and aquatic ecosystems within the United States and its territories, as well as the built environment." *Id.* at 46. According to the Corps, this baseline is "degraded" from "thousands of years" of human activity. *Id.* at 48, 84. However, the extent of this degradation is unclear because there is a "lack of data concerning: (1) the quantity of aquatic ecosystems across the country, (2) the degree to which those aquatic ecosystems perform various ecological functions and services, (3) the numbers, types, and impacts of federal, non-federal, and private actions across the country that may affect the structure and functions of aquatic ecosystems, (4) what types of interactions are likely to occur among the various anthropogenic disturbances to aquatic ecosystems, (5) the degree to which those aquatic ecosystems are resilient to disturbances, and (6) other data gaps." *Id.* at 37–38.

142.    When it came to assessing the impacts of Nationwide Permit 12, the Corps forecast that the permit would be used to authorize 18,500 activities over five years, resulting in impacts to approximately 7,500 acres of waters of the United States. *Id.* at 108. However, the Corps did not know what those specific activities would be or where they would take place. Even if the Corps could predict where Nationwide Permit 12 would be used, it noted that, "[i]n most cases, our current understanding of aquatic ecosystems or other ecosystems is not sufficient for

predicting how they are likely to respond to single disturbances or multiple disturbances" like Nationwide Permit 12 activities. *Id.* at 32.

143. Accordingly, the Corps found that it is difficult to conclude, with any confidence, that the issuance of Nationwide Permit 12 will have no more than minimal cumulative effects.

144. Due to this uncertainty and the "paucity of data," the Corps resorted to describing the effects of Nationwide Permit 12 in "qualitative" terms. *Id.* at 13–14. For example, the Corps noted that Nationwide Permit 12 activities "may adversely affect" groundwater supplies "by adding pollutants to . . . groundwater." *Id.* at 100. The Decision Document includes no other discussion of possible effects on groundwater quality.

145. In the Decision Document, the Corps also disclaimed the need to fully assess the impacts of several secondary effects of pipeline construction, including oil spills and natural gas leaks, spills of drilling fluids during horizontal-directional drilling under waterbodies, and upland pipeline construction. *Id.* at 49, 93–95.

146. Ultimately, the Corps concluded that "activities authorized by [Nationwide Permit 12] will result in no more than minimal individual and cumulative adverse environmental effects" under the CWA and are not likely to result in a "significant effect" on the environment under NEPA because of a constellation of factors, including: (1) the small proportional effects of Nationwide Permit 12 when weighed against other human activities; (2) the Corps' definition of "single and complete" crossing; (3) Nationwide Permit 12's half-acre limit per crossing; (4) compensatory mitigation; (5) as-yet unidentified regional conditions; (6) Nationwide Permit general conditions; and (6) the Corps' discretionary authority to modify, suspend, or revoke Nationwide Permit 12 authorization.

147.     In its Decision Document, the Corps did not state it would have taken the same action if one of the factors listed in paragraph 146 were unavailable. Rather, the Corps contended that it is the combination of these factors that together support the agency's decision.

### Other human activities

148.     According to the Corps, "[b]ecause the activities authorized by [Nationwide Permit 12] constitute only a small proportion of the categories of human activities across the country that directly and indirectly affect" aquatic ecosystems, "the activities authorized by this NWP during the period it is anticipated to be in effect are likely to result in only a minor incremental change to the jurisdictional waters and wetlands in the affected environment." Decision Document at 38.

149.     In other words, the Corps found the adverse effects of Nationwide Permit 12 activities are insignificant or minor when weighed against all other aquatic ecosystem disturbances.

150.     Courts have previously told the Corps this approach to nationwide permit analysis does not satisfy the CWA or NEPA.

### "Single and complete" crossing

151.     According to the Corps, its definition of "single and complete project" helps ensure no more than minimal environmental effects. *Id.* at 142.

152.     Federal agencies, including EPA and FWS, however, have warned the Corps that its definition of "single and complete" project allows large linear projects to be effectively piecemealed.

153.     Because each "separate and distant" waterbody crossing is considered its own Nationwide Permit 12 project, the Corps can "stack" Nationwide Permit 12 approvals to

authorize thousands of waterbody crossings for a single pipeline project without conducting a pipeline-specific cumulative effects analysis under NEPA or the CWA.

154. The Corps has never defined the term "separate and distant" at the national level. The Corps claims that "separate and distant" crossings are generally "scattered throughout a large landscape" and are located "a substantial distance from each other." 91 Fed. Reg. at 841. However, the Corps has provided no evidence to support this contention.

155. The Corps has also claimed that the term "separate and distant" is more appropriately determined by district engineers on a case-by-case basis.

156. However, Corps district-level staff have complained that the term "separate and distant" is unclear and have requested additional guidance from Corps headquarters.

157. Federal agencies, including the FWS, have also warned the Corps that its failure to provide any guidance on what constitutes a "separate and distant" crossing may allow utility projects to proceed despite more than minimal effects to local waterbodies and watersheds.

158. Indeed, Corps districts have used Nationwide Permit 12 to authorize waterbody crossings for pipelines with dozens of waterbody crossings per mile.

159. For many of these pipelines, the Corps never made an explicit "separate and distant" finding for any of the pipeline project's waterbody crossings.

160. For example, the Corps authorized the developer of the now-defunct Atlantic Coast Pipeline to cross more than 1,600 waterbodies using Nationwide Permit 12. In some places, the project would have had twenty-nine waterbody crossings per mile—an average of about one crossing every 180 feet. However, the Corps' Nationwide Permit 12 verification letters made no explicit "separate and distant" finding for these crossings.

161.    Similarly, the developer of the proposed South System Expansion 4 pipeline plans to use Nationwide Permit 12 to cross more than 1,300 waterbodies starting this fall. In some places, the project would have fifty-five crossings per mile—an average of about one crossing every 96 feet. In another location, the project would cross a single waterbody—Kimbrough Creek—six separate times in one tenth of a mile, or about one crossing every 88 feet.

**Half-acre per-crossing limit**

162.    According to the Corps, its prohibition on the "loss" of more than a half-acre per crossing will help "ensure that each single and complete project will cause no more than minimal adverse environmental effects." Decision Document at 136–37.

163.    As used here, "loss" "refers to permanent adverse effects" and does not include effects the Corps categorizes as "temporary." *Id.* at 136.

164.    For those "permanent adverse effects," Nationwide Permit 12 includes no limit on the amount of jurisdictional waters that can be lost by a single pipeline project. Nor does Nationwide Permit 12 impose a total cap on the acreage of jurisdictional waters that can be lost by pipeline projects collectively.

165.    There also is no acreage limit for "temporary" impacts that can be authorized under Nationwide Permit 12.

166.    The terms of Nationwide Permit 12 do "require restoration back to preconstruction elevations" following construction. 91 Fed. Reg. at 795. Corps staff, however, have observed that it is almost impossible to comply with Nationwide Permit 12's directive to restore waters of the United States to their preconstruction contours.

167.    In sum, so long as no more than a half-acre of jurisdictional waters are permanently "lost" at each crossing (and so long as other Nationwide Permit 12 terms and

conditions are met), the Corps can authorize thousands of waterbody crossings—and consequently hundreds of acres of permanent and temporary impacts—at a single time for a single pipeline.

168. For example, the Corps used Nationwide Permit 12 to authorize 2,227 waterbody crossings for the 485-mile Gulf Coast Pipeline. Together, these crossings impacted hundreds of acres of jurisdictional waters, including 130 acres of forested wetlands.

169. Collectively, the Corps estimates that Nationwide Permit 12 was used to authorize over 224,000 waterbody crossings between 2007 and 2026. These 224,000-plus waterbody crossings were predicted to have permanent or temporary impacts on more than 17,900 acres of jurisdictional waters.

170. Seventeen thousand nine-hundred acres is equivalent to nearly 28 square miles— an area larger than the island of Manhattan.

171. Federal agencies, including FWS, have warned the Corps that collective adverse impacts to as few as five acres from a single linear utility project may cause more than minimal environmental effects.

172. Federal agencies have also warned the Corps that irregular tracking of Nationwide Permit 12's acreage impact makes it difficult for the Corps to tell if Nationwide Permit 12 projects are collectively having more than minimal effects.

173. Upon information and belief, the Corps does not keep districts apprised of how many acres of jurisdictional waters have been collectively lost due to Nationwide Permit 12 activities during each five-year permit period.

174. In addition, the Corps' primary tracking database does not distinguish between permanent and temporary impacts from Nationwide Permit 12 projects.

175. The Corps also does not track Nationwide Permit 12 activities that do not require a preconstruction notification.

176. As a result, the Corps does not know how many total acres of waters of the United States are lost due to Nationwide Permit 12 activities each year and during each five-year permit term.

177. Nationwide Permit 12's half-acre limit also allows potentially sizeable impacts to headwater streams.

178. If the Corps applied the half-acre limit to a 10-foot-wide stream, for instance, Nationwide Permit 12 would allow the loss of up to 2,178 linear feet of stream. According to FWS, such an impact—standing alone—would be unlikely to comply with the CWA.

179. EPA has also agreed that impacts to miles of headwater streams may be masked by Nationwide Permit 12's half-acre limit.

180. The Corps does not know how many linear feet of stream are impacted by Nationwide Permit 12 projects each year, either individually or cumulatively. The same is true for each five-year permit term.

**Compensatory mitigation**

181. According to the Corps, compensatory mitigation will help "reduce the incremental contribution of [Nationwide Permit 12] activities to the cumulative effects on the Nation's wetlands, streams, and other aquatic resources." Decision Document at 117.

182. At the time it issued its Decision Document, the Corps did not know what mitigation measures would be applied to specific projects.

38

183.    While the Corps' Decision Document described some potential mitigation measures, it noted that such measures "typically" cannot fully restore ecosystem functions. *Id.* at 109.

184.    Indeed, studies cited favorably by the Corps in the Decision Document report that "current restoration practice[s] fail[] to recover original levels of wetland ecosystem functions, even after many decades." David Moreno-Mateos et al., *Structural and Functional Loss in Restored Wetland Ecosystems*, 10 PLoS Biology 1 (2012); *see also* Ellen Wohl, et al., *The Science and Practice of River Restoration*, 51 Water Res. Rsch. 5974, 5990 (2015) (identifying a "widespread inability to restore full river function and ecological communities comparable to reference conditions"); Margaret Palmer et al., *Ecological Restoration of Streams and Rivers: Shifting Strategies and Shifting Goals*, 45 Ann. Rev. Ecology Evolution & Systematics 247, 259 (2014) ("[I]n the vast majority of cases restoration of habitat does not lead to restoration biologically.").

185.    Even if mitigation is well-intentioned and well-designed, permittees often fail to undertake required mitigation or meet permit conditions.

186.    Indeed, Corps staff have agreed that the agency has a problem with infrequently performed mitigation.

187.    According to one primary source cited by the Corps in its Decision Document, "numerous studies on mitigation required by permits revealed that as much as 34% of the [required] mitigation was never installed." Nat'l Acads. of Scis., Eng'g, & Med., *Compensating for Wetland Losses Under the Clean Water Act*, 101 (2001); *see also id.* at 109 ("The committee concludes that some mitigation will not be fully implemented.").

188. The Corps does not conduct compliance inspections of required mitigation for most projects.

189. Even if mitigation is installed and performs adequately, compensatory mitigation is not required for many Nationwide Permit 12 activities.

190. For instance, district engineers cannot require compensatory mitigation for Nationwide Permit 12 projects that do not require a preconstruction notification. These projects can proceed without any Corps involvement whatsoever.

191. The Corps also does not require compensatory mitigation for temporary impacts from Nationwide Permit 12 activities. Instead, the Corps only requires compensatory mitigation for permanent impacts to jurisdictional waters.

## Regional and activity-specific conditions

192. Following the issuance of a nationwide permit, regional and district engineers retain the discretion to add regional or activity-specific conditions to nationwide permits, including Nationwide Permit 12.

193. According to the Corps, regional and activity-specific permit conditions "will help ensure" that Nationwide Permit 12 "will result in no more than minimal individual and cumulative adverse environmental effects." Decision Document at 14.

194. The Corps, however, did not identify or specifically describe regional conditions in its Decision Document.

195. When the Corps reissued Nationwide Permit 12 on January 8, 2026, no regional conditions for the 2026 version of Nationwide Permit 12 were in place.

196. The Corps also did not identify or specifically describe any activity-specific conditions in its Decision Document.

197.   When the Corps reissued Nationwide Permit 12 on January 8, 2026, no activity-specific conditions for the 2026 version of Nationwide Permit 12 were in place.

### General conditions

198.   When it issued its nationwide permits in 2026, the Corps created 32 general conditions applicable to all nationwide permits.

199.   According to the Corps, "the protections provided by [nationwide permit program's] general conditions . . . will help ensure" Nationwide Permit 12 activities have no more than minimal effects. Decision Document at 14.

200.   However, the Corps' position is that it has no independent obligation to assess permittees' compliance with nationwide permit program general conditions—except for General Conditions 18 and 20—once a nationwide permit is issued, including when verifying the application of a nationwide permit to a project in response to a preconstruction notification.

201.   Upon information and belief, the Corps is aware that permittees are not consistently complying with permit conditions, including general conditions.

### Discretionary authority

202.   According to the Corps, the "division and district engineer's authority to modify, suspend, or revoke [Nationwide Permit 12] authorization on a regional or activity-specific basis is likely to be the most effective approach for ensuring in a particular region that [Nationwide Permit 12] authorizes only those activities that have no more than minimal cumulative adverse environmental effects." *Id.* at 29.

203.   The cumulative effects of Nationwide Permit 12 cannot be evaluated in the context of a single Corps division, district, or project.

41

204.    Indeed, Corps district engineers are not responsible for analyzing cumulative effects at the national scale.

205.    District engineers are also not responsible for evaluating the cumulative effects of Nationwide Permit 12 activities authorized under previous iterations of Nationwide Permit 12.

206.    Moreover, Corps engineers cannot assess the cumulative effects of projects they do not know about. If project developers are not required to submit a preconstruction notification for their Nationwide Permit 12 project, then they can start construction without notifying the Corps at all.

### The Corps' 2026 Nationwide Permit 12 ESA Analysis

207.    On January 2, 2026, the Corps published a biological assessment for the proposed issuance and reissuance of the 2026 nationwide permits, including Nationwide Permit 12.

208.    According to the biological assessment, the reissuance of Nationwide Permit 12 will have "no effect" on ESA-listed species and critical habitat. U.S. Army Corps of Eng'rs, Biological Assessment for the Proposed Issuance and Reissuance of the 2026 Nationwide Permits at 29–30 (2026). As a result, the Corps concluded that "there is no requirement that the Corps undertake programmatic [Section 7] consultation for the [nationwide permit] program." *Id.* at 37.

209.    The Services have not concurred with the biological assessment's conclusions.

210.    According to the Corps, General Condition 18 and 33 C.F.R. § 330.4(f) prevent the issuance of Nationwide Permit 12 from having any effect on ESA-listed species and critical habitat. General Condition 18 and 33 C.F.R. § 330.4(f) require non-federal permittees to notify the Corps if the permittee determines that their activity "might affect" or will occur "in the vicinity" of ESA-listed species or designated or proposed critical habitat. 91 Fed. Reg. at 877; 33

42

C.F.R. § 330.4(f)(2). If that occurs, the permittee "shall not begin work" until the Corps has concluded the action will have no effect on listed species "or until ESA section 7 consultation or conference has been completed." 91 Fed. Reg. at 877; *see also* 33 C.F.R. § 330.4(f)(2).

211.    General Condition 18 and 33 C.F.R. § 330.4(f) allow non-federal permittees to make the initial determination whether their proposed activity might affect or occur in the vicinity of listed species or critical habitat.

212.    If the non-federal permittee concludes that their Nationwide Permit 12 activity will have no effect on listed species and does not submit a preconstruction notification for a separate purpose, the Corps has no ability to verify the permittee's "no effect" determination.

213.    Apart from directing non-federal permittees to the Services' websites, the Corps has provided no national-level written guidance to assist non-federal permittees in complying with General Condition 18 or 33 C.F.R. § 330.4(f).

214.    The Corps also has not defined the term "in the vicinity of" as used in General Condition 18 and 33 C.F.R. § 330.4(f). Instead, the agency leaves it up to non-federal permittees to interpret and apply this term.

215.    NMFS has warned the Corps that "in the vicinity of" is a broad, vague, and potentially problematic term. According to NMFS, without a definition to provide some guidance, non-federal permittees may overlook effects on listed species.

216.    Internally, Corps staff have acknowledged that most people in the United States do not know whether listed species are or could be present in a given area, even areas right outside their homes.

217.    NMFS has also told the Corps that it is unreasonable to assume that the non-expert pipeline developers have sufficient knowledge to make initial-effect determinations.

43

218.     The Corps also does not require strict adherence to General Condition 18 or 33 C.F.R. § 330.4(f)(2) during and after emergencies.

219.     Specifically, the Corps allows activities authorized by nationwide permits to move forward without completing Section 7 consultation if the Corps determines an "emergency" exists.

220.     For example, the Corps recently verified the use of several nationwide permits to reconstruct a railroad on the North Carolina–Tennessee state line using emergency procedures. Though the Corps concluded the reconstruction may adversely affect listed species, it did not complete Section 7 consultation before issuing its verifications.

221.     Construction of the railroad on the North Carolina–Tennessee state line has now been completed including all activities authorized by nationwide permits. Upon information and belief, the Corps has still not completed Section 7 consultation related to its use of nationwide permits for that project.

222.     The Corps, FWS, and NMFS have been instructed to use emergency procedures—including emergency ESA procedures—"to the maximum extent permissible" to authorize projects to "facilitate the Nation's energy supply," including oil and gas pipelines. Exec. Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025).

223.     The Corps is aware that multiple, individual Nationwide Permit 12 projects affect the same listed species over the five-year term of the permit.

224.     For example, between January 1, 2022, and December 31, 2024, the Corps completed formal Section 7 consultation for at least 12 nationwide permit activities affecting piping plover (an ESA-listed bird); at least 14 nationwide permit activities affecting clubshell (an ESA-listed mussel); at least 70 nationwide permit activities affecting bull trout (an ESA-listed

fish); at least 133 nationwide permit activities affecting loggerhead sea turtles (an ESA-listed turtle); at least 219 nationwide permit activities affecting northern long-eared bat (an ESA-listed bat); and at least 225 nationwide permit activities affecting chinook salmon (another ESA-listed fish). Overall, the Corps completed formal Section 7 consultation for over 2,700 activities authorized under nationwide permits over that time period.

225.    When the Corps completes individual, project-specific Section 7 consultation for a nationwide permit project, it does not consider the overall effect of all activities authorized under the nationwide permit on that species. Instead, it only considers the effects of the specific project.

226.    As an example, upon information and belief, the 225 project-specific Section 7 consultations completed for chinook salmon referenced above do not each assess the overall effect on chinook salmon of the nationwide permit program. Instead, the Section 7 consultations only assess the effects of each individual project.

227.    On April 1, 2026, Conservation Groups emailed and mailed written notice of the ESA violations described in Claim 2 below to Secretary of Interior Doug Burgum, Secretary of Commerce Howard Lutnick, U.S. Fish & Wildlife Service Director Brian Nesvik, National Marine Fisheries Service Assistant Administrator Eugenio Soler, and U.S. Army Corps of Engineers Commander Lt. Gen. William H. Graham, Jr. *See* Exhibit 1.

228.    Assistant Administrator Soler received a hard copy of the notice letter on April 4, 2026. Secretary Burgum, Secretary Lutnick, Director Nesvik, and Lieutenant General Graham, Jr., received hard copies of the notice letter on April 6, 2026.

## CLAIMS FOR RELIEF

### Claim 1: The Corps' 2026 Reissuance of Nationwide Permit 12 Violated the CWA

229.    Conservation Groups incorporate by reference paragraphs 1 to 228.

230.    Under Section 404 of the CWA, the Corps may only issue nationwide permits for categories of activities that "are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect[s] on the environment." 33 U.S.C. § 1344(e)(1). These three determinations "shall" be documented in writing and "must be completed before any [nationwide] permit is issued." 40 C.F.R. § 230.7(b).

231.    The Corps' individual and cumulative minimal-effects determinations for the 2026 reissuance of Nationwide Permit 12 are arbitrary, capricious, and not in accordance with the CWA and its implementing regulations in at least seven respects.

232.    First, the Corps' minimal-effects determinations are based on an arbitrary analysis of the environmental baseline.

233.    Second, the Corps' minimal-effects determinations are based on generic, unsupported, and inapplicable mitigation measures that the Corps acknowledged are not often undertaken, frequently fail to satisfy permit conditions, are not often ecologically successful, and do nothing to mitigate temporary impacts.

234.    Third, the Corps' minimal-effects determinations are arbitrarily based on data that the Corps acknowledged is incomplete, unavailable, speculative, variable, or uncertain.

235.    Fourth, the Corps arbitrarily deferred its national minimal-effects determinations to divisional and district engineers.

236.    Fifth, the Corps arbitrarily relied on the definition of "single and complete project" to support its minimal-effects determinations.

237.    Sixth, the Corps' minimal-effects determinations arbitrarily fail to account for Nationwide Permit 12's secondary effects.

46

238.    Seventh, the data available to the Corps indicates that Nationwide Permit 12 will cause more than minimal individual and cumulative effects.

239.    Accordingly, the Corps' minimal-effects determinations for the 2026 reissuance of Nationwide Permit 12 are arbitrary, capricious, and not in accordance with the CWA, 33 U.S.C. § 1344(e), and the APA, 5 U.S.C. 706.

**Claim 2: The Corps' 2026 Reissuance of Nationwide Permit 12 Violated the ESA**

240.    Conservation Groups incorporate by reference paragraphs 1 to 228.

241.    Section 7 of the ESA requires federal agencies to ensure "that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). To that end, Section 7 and its implementing regulations require agencies to formally consult with FWS and/or NMFS for any actions that "may affect" listed species or critical habitat. *Id.*; 50 C.F.R. §§ 402.14(a)–(b). The federal action agency is responsible for making this initial-effects determination. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

242.    Nationwide Permit 12 is an action "authorized, funded, or carried out" by the Corps.

243.    Activities permitted under Nationwide Permit 12 have adversely affected threatened or endangered species, and designated critical habitat, in the past.

244.    Activities permitted under Nationwide Permit 12 may adversely affect threatened or endangered species, and designated critical habitat, in the future.

245.    The Corps does not account for the aggregate effects of all Nationwide Permit 12 activities when engaging in formal Section 7 consultation over individual projects permitted with Nationwide Permit 12.

47

246. The Corps did not complete formal Section 7 consultation when issuing the 2026 version of Nationwide Permit 12.

247. Multiple courts, including this Court, have concluded that the Corps must formally consult under the ESA when issuing Nationwide Permit 12.

248. The Corps' 2026 reissuance of Nationwide Permit 12 is arbitrary, capricious, and not in accordance with the ESA in at least three ways. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402; 5 U.S.C. § 706.

249. First, the Corps failed to formally consult with FWS and NMFS regarding the 2026 reissuance of Nationwide Permit 12 even though that reissuance may adversely affect listed species or critical habitat.

250. Second, the Corps illegally delegated its initial-effects determination to non-federal permittees.

251. Third, the Corps' Nationwide Permit 12 Decision Document arbitrarily relied on General Condition 18 and 33 C.F.R. § 330.4(f) to ensure the reissuance of Nationwide Permit 12 would have "no effect" on listed species or critical habitat.

252. Accordingly, the Corps' 2026 reissuance of Nationwide Permit 12 is arbitrary, capricious, and not in accordance with the ESA, 16 U.S.C. § 1536, and the APA, 5 U.S.C. 706.

**Claim 3: The Corps' 2026 Reissuance of Nationwide Permit 12 Violated NEPA**

253. Conservation Groups incorporate by reference paragraphs 1 to 228.

254. NEPA requires agencies to prepare an EIS for proposals for major federal actions significantly affecting the quality of the human environment. 42 U.S.C. § 4332. If the need for an EIS is unclear—i.e., if it is uncertain whether the major federal action will significantly affect the quality of the human environment—an agency may first prepare an EA. *Id.* § 4336(b)(2).

255.    If the EA concludes that the proposal will likely have significant effects, or if there are substantial questions about whether an action may have significant effects, the agency must prepare an EIS. *See* 33 C.F.R. § 333.20(a); *Blackwood*, 161 F.3d at 1212. If the EA reveals that the action will not have significant effects, then the action can proceed with a Finding of No Significant Impact. 33 C.F.R. § 333.16(a). However, a Finding of No Significant Impact must document "*why* . . . the selected alternative will not have a significant effect on the quality of the human environment." *Id.* § 333.16(a)(2) (emphasis added).

256.    Whether the agency completes an EIS or an EA and Finding of No Significant Impact, it must take a "hard look" at the proposal's "environmental consequences." *Robertson*, 490 U.S. at 350.

257.    The Corps' 2026 reissuance of Nationwide Permit 12 was a major federal action for purposes of NEPA.

258.    The Corps' 2026 reissuance of Nationwide Permit 12 had reasonably foreseeable effects on the environment.

259.    Accordingly, the Corps was required to comply with NEPA when reissuing the 2026 version of Nationwide Permit 12. *See* 42 U.S.C. § 4332.

260.    The Corps' EA and Finding of No Significant Impact for Nationwide Permit 12 was arbitrary, capricious, and not in accordance with NEPA and the Corps' implementing regulations in at least two respects.

261.    First, the Corps failed to take a "hard look" at Nationwide Permit 12, *see Robertson*, 490 U.S. at 350, including the environmental baseline, the Corps' anticipated mitigation measures, and the present effects of past Nationwide Permit 12 activities, among other things.

49

262.    Second, because Nationwide Permit 12's effects are significant, or because there are at least substantial questions whether Nationwide Permit 12 may have a significant effect on the environment, the Corps violated NEPA and the Corps' implementing regulations by (1) failing to prepare an EIS and/or (2) failing to rationally explain why Nationwide Permit 12 will not have a significant effect on the quality of the human environment.

263.    Accordingly, the Corps' 2026 reissuance of Nationwide Permit 12 is arbitrary, capricious, and not in accordance with NEPA, 42 U.S.C. § 4332, and the APA, 5 U.S.C. 706.

### **PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court:

A.    DECLARE that Corps' 2026 reissuance of Nationwide Permit 12 violated the Clean Water Act, Endangered Species Act, National Environmental Policy Act, Administrative Procedure Act, and applicable regulations in the respects set forth above;

B.    VACATE and set aside the Corps' January 8, 2026, reissuance of Nationwide Permit 12;

C.    ENJOIN or STAY Defendants from using Nationwide Permit 12 until the Corps has completed formal Endangered Species Act Section 7 programmatic consultation and complied with applicable statutes and regulations;

D.    AWARD Plaintiffs their reasonable costs, fees, and expenses, including attorney's fees, associated with this litigation; and

E.    GRANT Plaintiffs such further and additional relief as the Court may deem just and proper.


Respectfully submitted, this the 27th day of July, 2026.

/s/ Spencer Scheidt
Spencer Scheidt
N.C. Bar No. 57078
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Ave., Suite 304
Asheville, NC 28801-3321
Telephone: 828-258-2023
sscheidt@selc.org

/s/ J. Patrick Hunter
J. Patrick Hunter (*pro hac vice pending*)
N.C. Bar No. 44485
SOUTHERN ENVIRONMENTAL LAW CENTER
48 Patton Ave., Suite 304
Asheville, NC 28801-3321
Telephone: 828-258-2023
phunter@selc.org

*Attorneys for Conservation Groups*

51